# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**GARRY PARKER,**

        **Plaintiff,**

                                **Civil Action 2:17-cv-633**

      **v.**                          **JUDGE EDMUND A. SARGUS, JR.**

                                **Magistrate Judge Elizabeth P. Deavers**

**BRECK'S RIDGE, LLC,** *et al.*,

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant Breck's Paving, Inc.'s ("Breck's Paving") Motion to Decertify the Conditional Class Certification (ECF No. 61); Defendant Breck's Ridge, LLC's ("Breck's Ridge") Motion for Summary Judgment and to Decertify the Conditional Class (ECF No. 62); Breck's Paving's Motion for Summary Judgment (ECF No. 63); Named Plaintiff Garry Parker's ("Plaintiff") Responses in Opposition (ECF Nos. 67, 68, 69, 70); Defendants' Reply briefs (ECF Nos. 73 & 74); Breck's Paving's Motion for Leave to File the Supplemental Affidavits of Carl Castle, Max Laudermilt, Joel Robis, and Steven Bloxam (ECF No. 75); and Plaintiff's Motion to Strike the Affidavits of Barbara Bloxam, Carlos Medina, and Kevin Imer (ECF No. 76).

For the reasons that follow, Breck's Paving's Motion to Decertify the Conditional Class Certification is **GRANTED** (ECF No. 61); Breck's Ridge's Motion for Summary Judgment and to Decertify the Conditional Class is **GRANTED in part** and **DENIED in part** (ECF No. 62); and Breck's Paving's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** (ECF No. 63).

# I.

## A.  Factual Background

Prior to its sale in 2016, Breck's Paving was an asphalt removal, repair, and installation company located in central Ohio.  (Bloxam Aff. ¶ 2–3).  In addition to installing driveways and parking lots for individual home owners, Breck's Paving provided services to "gas stations, churches, and other commercial entities."  (*Id.* ¶ 3).  The company "was incorporated and actively conducted business from June 29, 1995, to April 10, 2016."  (*Id.* ¶ 2).  Barbara Bloxam ("VP Bloxam") acted as the Vice President, Secretary, and Treasurer of Breck's Paving.  (*Id.* ¶ 1).  VP Bloxam's husband, Kevin Bloxam ("CEO Bloxam"), was the President.  (*Id.*).

According to VP Bloxam's testimony, most Breck's Paving workers "did not work at the central location or a single job site."  (*Id.* ¶ 6).  Instead, work crews would clock-in at the business office in the morning, "travel and work at various and multiple job sites throughout central Ohio" during the day, and return to Breck's Paving at the end of the workday to clock-out.  (*Id.*).  VP Bloxam further testified that "[e]ach employee was required to take a 30 minute, unpaid break, each work day . . . for the safety of the employee due to summer weather, the hot asphalt, and the physical nature of the work."  (*Id.* ¶ 7).

When calculating payroll, VP Bloxam testified that the "30 minute, unpaid break was automatically deducted from the total number of hours worked between the time the employee clocked in and the time the employee clocked out."  (*Id.*; *see also* VP Bloxam Dep. 102:16–20, ECF No. 66-1).  In her deposition testimony, VP Bloxam further testified:

A.  A half an hour lunch is required.

Q.  Okay.

A.  If it's not taken, you go to a supervisor and you report when you come in—

2

Q. Okay.

A. –that you didn't take lunch, and then it would not be deducted. It would be initialed that there was no lunch taken.

(VP Bloxam Dep. 93:16–23). In addition, VP Bloxam testified during her deposition that "[t]he company policy says you have to at least take half an hour. If [the employees], for some reason, cannot due to work or whatever, then you notify [management]." (Id. at 117:1–4).

Plaintiff worked for Breck's Paving as a dump truck driver, where he "drove a dump truck to and from jobsites delivering stone and asphalt from quarries." (Id. ¶ 14). According to Plaintiff's testimony, he was laid-off each year from January through March, and then hired back next work season. (Pl.'s Dep. 10:16–20). In August 2015, Plaintiff was promoted to Stone Foreman, "where he supervised 2 to 6 personnel including dump truck drivers and laborers." (Bloxam Aff. ¶ 14). As part of his responsibilities as Stone Foreman, Plaintiff graded driveways as a skid load operator, oversaw prep work, and ordered necessary stone materials. (Pl.'s Dep. 13:1–14:11; Bloxam Aff. ¶ 14). According to VP Bloxam, Breck's Paving "never asked [Plaintiff] to work during his 30 minute break." (Bloxam Aff. ¶ 18). Instead, VP Bloxam testified that management "consistently and frequently reinforce[d] to all . . . employees that they should not work during their 30 minute break." (Id.). Based on VP Bloxam's testimony, Plaintiff's time card was marked with "'NL' a total of 32 times: 17 from July 20, 2014, to December 12, 2014; and 15 from March 30, 2015, to December 3, 2015." (Id. ¶ 16).

During his deposition, Plaintiff testified that VP Bloxam and CEO Bloxam never asked him to work before or after clocking out. (Pl.'s Dep. 84:2–4; 97:5–10). In addition, Plaintiff testified that there was never a time when he worked overtime and did not get paid time and a half. (Id. at 100:6–12). According to Plaintiff's testimony, neither VP Bloxam nor CEO Bloxam ever told Plaintiff to work through his lunch break. (Id. at 88:21–89:2). Moreover, Plaintiff testified

3

that he was aware of Breck's Paving's mandatory lunch break policy. (*Id.* at 86:4–12). Although Plaintiff acknowledged that he wrote NL on this timecard "[m]aybe once," he testified that he only did so because Mr. Justus "said just put NL on there and maybe you'll get paid for it and maybe you won't." (*Id.* at 93:18–20 & 95:11–12). Plaintiff further testified that: (1) he was not paid for lunch when he marked NL, and (2) he never requested to have 30 minute lunch breaks credited back to his timecard. (*Id.* at 99:9–16; 95:23–25). Additionally, he testified that "I know other people did [mark NL] and [30 minutes] still got taken out of your day anyway." (*Id.* at 93:23–25).

However, Plaintiff noted that Breck's Paving maintained an open-door policy, in which employees were free to speak directly with VP Bloxam or CEO Bloxam about timecards or paychecks. Specifically, Plaintiff testified:

> Q. Okay. In your experience with Breck's Paving from July of 2014 to April 10th of 2016 if you went to [CEO Bloxam] and [VP Bloxam] and said, hey, there's a mistake with my payroll, they would fix it?
>
> A. Oh, yeah.

(*Id.* at 133:14–18). In addition, Plaintiff testified:

> A. I've always added up my hours at the end of the week, and when I got my check, if I felt it was incorrect, then I would have let them know.
>
> Q. How would you let them know?
>
> A. I would walk in the office and say, look, this is what I got, this is what's on my check, can you check it for me.
>
> Q. And what would they do?
>
> A. They would check it.
>
> Q. Would they fix it?
>
> A. They would correct it.

(*Id.* at 132:10–22).

4

Plaintiff further testified that he never experienced racial discrimination while working at Breck's Paving. (*Id.* at 78:14–79:13). In Plaintiff's words: "[CEO Bloxam] would not allow [racial discrimination] at Breck's Paving ever." (*Id.* at 78:22–23). Moreover, Plaintiff testified that he never felt discriminated against or faced negative employment consequences due to his race at Breck's Paving. (*Id.* at 79:6–13).

### 1. Transfer of Ownership

On April 10, 2016, Breck's Paving "sold and completely transferred all ownership, assets, interest, and control" to Breck's Ridge pursuant to an asset purchase agreement. (*Id.* ¶ 12). Following the sale, Breck's Ridge continued business operations by installing and maintaining asphalt driveways—primarily for "tract home developments." (Fissel Dep. 18:8–16). According to current CEO Mark Fissel ("CEO Fissel"), the company still operates under the name Breck's Paving. (*Id.* at 17:22–18:7). CEO Fissel testified that when Breck's Ridge began operations in 2017, Kevin Imer ("Mr. Imer") and Rick Justus ("Mr. Justus") were promoted to co-managers of the company. CEO Fissel also testified that "[Mr. Justus] was handling all the field operations and was the superintendent over all the foremen, and [Mr. Imer] was managing the office and sales." (*Id.* at 23:9–15). In addition, CEO Fissel testified that "both of those two gentlemen were reporting to me." (*Id.* at 23:17–19).

CEO Fissel testified that Plaintiff worked as an hourly employee for roughly $20 per hour. (*Id.* at 36:10–17). CEO Fissel further testified that each employee was compensated for "the number of hours that he worked, which for those guys almost always are over 40." (*Id.* at 36:18–24). According to CEO Fissel's testimony, Breck's Ridge did not compensate employees for time clocked before 7:00 A.M. (*Id.* at 82:3–16). Moreover, CEO Fissel testified that Breck's Ridge continued the practice of deducting a 30 minute lunch break from employee time cards after the

change in ownership.  (*Id.* at 51:21–52:3).  CEO Fissel testified that he reiterated the lunch policy in August 2016:

> I would say I was definitely aware of [the 30 minute break policy] when I came in in early August.  And even at one point—I can't recall exactly—in the fall, you know, there was a question about, "Hey, should we be getting paid for lunch," so we actually posted up by the time clock, kind of, what the policy is that's expected, that everybody takes 30 minutes.  And that was mainly due to safety.

(*Id.* at 52:20–53:3).  In addition, Breck's Paving Company Policy Book dated August 31, 2016 included the following provision: "[a] one-half hour lunch break is mandatory.  There will be no exception to this policy."  (BR Exhibit 2, ECF No. 56-3).

CEO Fissel testified there was no written policy regarding how to report a missed or interrupted lunch break.  (*Id.* at 57:14–20).  However, CEO Fissel testified that, "we kind of had a practice that the foreman would sign off [on a missed lunch] . . . by indicating on the timecard that, you know, "my crew didn't get a lunch that day."  So they'd have to initial."  (*Id.* at 57:2–6).  Moreover, CEO Fissel testified as follows:

> A.  If an employee worked through his meal period, it was the responsibility of the foreman to so indicate on the employee's timecard.  The foreman would do this by marking an NL, which stood for no lunch, next to that day's time punches.  The employee would then be paid for all time worked on that particular day including overtime if appropriate.  The plaintiff, Garry Parker, was responsible for marking NL on his own timecard, which he did.  He was accordingly paid for the time he worked during lunch.
>
> Q.  So your testimony is that they would put—you put the responsibility on the employees to mark NL, and that would somehow signal you to pay them for that 30 minutes?  Is that your testimony?
>
> A.  Yes.  I guess it was a way to make sure we were compensating employees in those rare circumstances outside the handbook.
>
> Q.  Okay.  But there's no policy—no written policy that I've seen that stands for this paragraph; is that correct?
>
> A.  No policy, but there is a general practice.  I think if you go back, you can kind of see that practice has existed.

6

(*Id.* at 84:16–85:14).

Plaintiff testified "[i]t was always told that you had a half hour for lunch and that it would be taken out, but you always didn't have time for that. So basically when you leave a job, you stop at a restaurant, you eat on your way." (Pl.'s Dep. 43:1–5). Furthermore, Plaintiff testified that "[i]t wasn't the foreman's job to make sure that [crew members] got a lunch." (*Id.* at 43:17–19). Moreover, Plaintiff disputes that Breck's Ridge never paid him for his missed lunches. Specifically, Plaintiff testified:

Q. Did anyone tell you that you had to mark your timecard no lunch, NL, if you didn't take a lunch?

A. No. But we did it sometimes just to see if we would get paid for it.

Q. And did you?

A. No.

Q. When you marked it as a no lunch you didn't get paid for that half hour?

A. No, sir.

Q. How do you know?

A. Because I kept up with my hours, that's how I know.

Q. Did you keep any kind of a record, a written record of that?

A. No.

Q. Did you ever report to the company that you weren't getting your full half-hour lunch?

A. Yeah, everybody knew we weren't. They all knew we weren't getting a full lunch. We didn't have time for that. We had to keep the production going. That's all that really mattered, production.

(*Id.* at 44:2–24).

Opt-in plaintiff Billy Burrell ("Mr. Burrell") testified that he was not aware of a provision in the handbook which mandated a 30 minute lunch break.  (Burrell Dep. 18:11–18, ECF No. 57-1).  When asked how often he took a lunch, Mr. Burrell testified "[m]ost of—most of the time, we didn't."  (*Id.* at 18:24–25).  Jeremy Howard ("Mr. Howard"), another opt-in plaintiff, testified that he was aware of the mandatory break policy, but "[y]ou just never had time to take any lunch break."  (Howard Dep. 13:4–25, ECF No. 56-1).  Neither Mr. Burrell nor Mr. Howard ever complained to management that they were not able to take lunch.  (Burrell Dep. 22:5–19; Howard Dep. 14:9–11).  According to Mr. Howard's testimony, "I just assumed that if you go complain, that probably would end up being your job, more or less, and for sure you weren't going to be getting put on the crew to do anything."  (Howard Dep. 14:12–16).

### 1. Breck's Ridge's Decision Not to Rehire Plaintiff

Plaintiff testified that Breck's Ridge management discriminated against him due to his race. (Pl.'s Dep. 15:18–21).  Specifically, Plaintiff testified as follows:

Q.  Tell me all the reasons why you believe you were discriminated against based on your race.

A.  Well, I had to deal with Kevin Imer, who was promoted to, I don't know what his position would be called, CEO of the company, whatever it was, and me and him had a history, and he basically told me that now that he was in charge, that he would make sure that I would be gone.  I also had to deal with him using the N-word all the time, and he never did it around people, he always did it just between me and him.

Q.  Okay.  Any other reasons why you believe you were discriminated against based upon your race?

A.  Well, I mean, it's just the fact that he told me, he said that a black person should not be in a supervisory position, I should not be in a supervisory position, there's no reason that I should be there, he would make sure that I didn't stay there, and he did it.  I mean, he also told me, he said, you know, niggers should be in Nigger Creek like they are in Gatlinburg, Tennessee, and if it was up to him that's exactly where I would be.

Q.  Any other reasons why you believe you were discriminated against based upon race?

A.  I also think I was discriminated against because I didn't get the bonus that all the other white supervisors got.

(*Id.* at 15:22–17:25).

When questioned about the nature of his history with Mr. Imer, Plaintiff testified:

A.  Kevin Imer just didn't like me.  He just never liked me.  Kevin Imer brought a AR-15 to work one day, and by the time he got home he couldn't find it, it disappeared, and he blamed it on me, and just different other things that I was—I was accused of stealing stuff, and it was like, really, I work hard just like he did, I didn't have to take anything.  I could buy whatever I wanted.

Q.  What were you accused of stealing?

A.  The AR-15, the rifle that he brought into the shop.

Q.  Any particular reason why he thought—that you're aware of why he thought—

A.  Because I'm the only black man there.

Q.  When did that happen?

A.  That was back in—that was right before—the year before Breck's Ridge took over.  He even met me at the gate with his brother to confront me before everybody got there that next morning . . .

Q.  What did they threaten to do?

A.  Told me they were going to do me bodily harm or whatever, you know, but they couldn't back this up.  I was not afraid.

Q.  Did you report that incident to anyone?

A.  No.  I just—most the time you just brush it over, leave it alone.

(*Id.* at 19:7–20:21).

Plaintiff testified that in spring 2016, Mr. Imer privately told Plaintiff that he would find a way to get rid of him, now that Mr. Imer had been promoted to co-manager.  (*Id.* at 21:12–25).

Plaintiff did not report the incident to anyone, testifying that "I felt it wouldn't do any good.  Him

9

and [CEO Fissel] was just good, cool with each other, so tight with each other, that I feel it wouldn't do no good." (*Id.* at 22:4–9). In addition, Plaintiff testified that Mr. Imer and CEO Fissel placed an individual named Tony on his crew to report back to them. Specifically, Plaintiff testified: "Tony would . . . say I wasn't doing this, I wasn't doing that, this was every single day I had to deal with that. CEO Fissel would call me in the office and say, well, Tony said you're not doing this." (*Id.* at 22:12–20).

With respect to the N-word, Plaintiff testified that Mr. Imer used the term twice in 2016. (*Id.* at 24:21–25). According to Plaintiff's testimony, the first incident occurred after Mr. Imer returned from a vacation in Gatlinburg. Plaintiff testified:

> He had went down to Gatlinburg for vacation and came back and couldn't wait to tell me, oh, you know what they call the river down in Gatlinburg, Tennessee, they call it Nigger Creek, that's because all of the disrespectful niggers are in there, that's where they put them.

(*Id.* at 24:3–8). Moreover, Plaintiff testified as follows:

> Q. And where did this comment occur?
>
> A. Always by the time clock. He always caught me when I was standing by the time clock.
>
> Q. Just that one time that he made the reference to the creek?
>
> A. No. The second time he made the reference to the creek was when he told me that black people shouldn't be in charge and where they all should be, is in that Nigger Creek right there.

(*Id.* at 24:18–25:2). Plaintiff testified that Mr. Imer was "slick with it because he never [made the comments] around any other people." (*Id.* at 21:23–25). Plaintiff further stated that he did not report either comment, testifying that "I felt it was not going to do any good. He had [CEO Fissel] so fooled, there was no way it was going to do any good." (*Id.* at 25:14–18).

Plaintiff testified that Mr. Imer was the only individual who made racist remarks towards him during his employment with Breck's Ridge.  (*Id.* at 68:16–18).  However, Plaintiff gave Mr. Imer high marks on his peer evaluation.  (*Id.* at 68:19–21).  Specifically, Plaintiff testified as follows:

> Q.  Now, on here, on your rating of Kevin Imer with but one exception you gave him all 10s, didn't you?
>
> A.  Because he was a good worker, and that's what this was based on, not supervisor.
>
> Q.  Okay.  You said he had an open-minded attitude, respected others' ideas, positive, doesn't complain, you gave him a 9 there, didn't you?
>
> A.  I pretty much gave everybody the same grades, if this is what supposedly I did.

(*Id.* at 68:19–69:4).

CEO Fissel testified that Mr. Imer had a "flamboyant personality . . . [b]ut was chummy with all the guys, and everyone liked [him]."  (Fissel Dep. 86:6–15).  CEO Fissel further testified that he had no personal knowledge of Mr. Imer making disparaging remarks to Plaintiff on account of his race.  (*Id.* at 96:12–22).  In addition, CEO Fissel testified that before Mr. Imer was promoted to comanager of Breck's Ridge, Plaintiff expressed interest in the position.  (*Id.* at 87:3–5).  Plaintiff confirmed CEO's Fissel's statement, testifying "I didn't apply for [the position], no, but I tried to apply for Imer's position.  I emailed [CEO Fissel], but I never got a response from him."  (Pl.'s Dep. 26:4–6).

According to CEO Fissel's testimony, he was frequently unsatisfied with Plaintiff's job performance.  (CEO Fissel Dep. 98:15–22).  Specifically, CEO Fissel testified: "I had, kind of, numerous issues with [Plaintiff] along the way from performance and attitude and just being a leader as a foreman on that crew.  And I talked to him a couple different times." (*Id.*).  For example, CEO Fissel testified that Plaintiff neglected to properly maintain his equipment; would not leave

11

his skid steer to assist crew members with manual labor; graded asphalt unevenly, costing the company money; and demonstrated a negative attitude.  (*Id.* at 98–102).  During one conversation with Plaintiff, CEO Fissel testified that he said:

> "Garry, you come in here grumping around.  You grump around at the end of the day.  You know, if you're a foreman, we really need you to—I mean, I know it's tough work, but I need you to have a better attitude with the guys because it rubs off on them."  And he said—And at the same time, I said, "You know, there was— what I'm hearing from the guys is—and I don't like this—is that you've been going around and saying that you're going to use the race card, and when you come back here next year, you guys are all going to be working for Parker Paving instead of Breck's Paving."  And I remember, he kind of rocked back in his chair and laughed.  And he was like, "I'm just joking."  I said, "I know.  I'm sure you are.  But you can see how that's a little bit of a—it comes off threatening."

(*Id.* at 102:1–18).

Plaintiff disputes that these conversations occurred.  According to his testimony, Plaintiff did not receive a single complaint regarding his job performance after Breck's Ridge purchased the company.  (Pl.'s Dep. 28:8–11).  Plaintiff testified that:

> [t]he only [comment] I received was when I sat down with [CEO Fissel] after Tony would report to him, [CEO Fissel] would ask me questions about whatever it was that Tony said to him.  He said, Garry, you don't get out of the loader to rake.  Okay that's why I have the laborers for.  I can't keep getting out of the loader and raking the ground.  I don't need them, if that's the case.  Tony wanted me to do his job as well as my job and every time it didn't happen, he would complain to [CEO Fissel].

(*Id.* at 28:11–21).  However, when asked to evaluate his own performance during his deposition, Plaintiff gave himself a 5–6 out of 10 on attendance, and a 7–8 out of 10 on attitude.  In addition, Mr. Justus, Mr. Imer, and coworker Carl Castle gave Plaintiff the lowest marks of any employee on their peer evaluation forms.  (Breck's Ridge Exhibit B, ECF No. 62-2).

At the end of the 2016 season, Plaintiff met with CEO Fissel to collect a bonus.  (Pl.'s Dep. 34:2–7).  Plaintiff testified that when he saw his bonus check, he "told [CEO Fissel] this isn't fair, it's nowhere near where I got last year and I let him know I wasn't happy with it."  (*Id.* at 35:12–

14).  CEO Fissel testified that "I handed [Plaintiff] his bonus in mid December; and it reflected, I guess, the performance and the issues that we were seeing, and it was a much lower number than he had in the past.  And he blew up on me, you know in the office."  (Fissel Dep. 103:17–21).  Plaintiff confirmed CEO Fissel's testimony, stating that he "probably" became angry in the meeting, but did not swear.  (Pl.'s Dep. 41:23–42:7).

CEO Fissel testified that he proposed putting a plan together over the winter months to address Plaintiff's performance issues.  (Fissel Dep. 103:22–104:3).  Specifically, CEO Fissel presented the idea that Plaintiff resume his previous role as a dump truck driver, stating: "[m]aybe the foreman, maybe the leadership role is not the place for you."  (Id. at 104:2–8).  According to Plaintiff's testimony, the meeting ended with him walking out.  (Pl.'s Dep. 39:6–7).  Plaintiff noted in his testimony that CEO Fissel said: "Garry, call me and we'll set up a meeting and we'll talk about it further."  (Id. at 39:10–12).  However, Plaintiff testified that he never called CEO Fissel because he "felt it wouldn't do any good."  (Id. at 39:13–16).

In March, Plaintiff received a telephone call from Mr. Imer indicating that Breck's Ridge would not be rehiring him for the next work season.  (Id. at 53:16–25).  Plaintiff testified that he experienced emotional distress after Mr. Imer's phone call, and lost roughly a month of pay before securing a job with the same pay at Americoat.  (Id. at 57:17–24; 61:1–62:5).  In addition, Plaintiff testified that: "I don't feel my employment was terminated from at will.  I feel it was discrimination from Kevin Imer."  (Id. at 52:14–16).  Finally, Plaintiff testified that, while working for Americoat, Mr. Imer called Americoat's CEO and said "[h]e did not want [Plaintiff] on the job that [Breck's Ridge] subcontracted out to [Americoat]."  (Id. at 58:20–25).  When asked if Plaintiff believes he suffered retaliation, he testified:

> Yeah, I think so.  I believe it.  Imer calling my job that I didn't work for him and telling them I couldn't work on a specific job even though it was contracted out by

> Americoat. Who is he to say don't send him on our job? At that point it's not your
> job. It's Americoat's job.

(*Id.* at 59:23–60:6).

CEO Fissel testified that both Mr. Imer and Mr. Justus had input into the decision not to

rehire Plaintiff. (Fissel Dep. 105:5–11). According to CEO Fissel's testimony, "I had talked to

both [Mr. Justus] and [Mr. Imer] as kind of the two-headed monster I guess, "Who do we want?"

So they weighed in on it, and we decided that we were not going to hire [Plaintiff]." (*Id.* at 98:2–

5). CEO Fissel further testified that "I would say I probably weighted [input] more towards Rick

Justus just because he was the field superintendent. He was the one getting most upset with—

because he follows, you know, you got the prep crew with [Plaintiff] . . . so he was kind of fighting

it every day, the quality issues." (*Id.* at 104:19–105:1). Finally, CEO Fissel testified that he was

not aware of any derogatory comments directed at Plaintiff, but "[he'd] like to think that [Plaintiff]

would have come to [him]." (*Id.* at 105:6–9).

## B. Procedural History

Plaintiff initiated this lawsuit on July 20, 2017 on behalf of himself and others similarly

situated. (ECF No. 1). In his Complaint, Plaintiff alleges: (1) unpaid overtime in violation of the

Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq.*; (2) unpaid overtime in

violation of the Ohio Minimum Fair Wage Standards Act ("Ohio Wage Act"), O.R.C. §§ 4111.03

& 4111.08; (3) unpaid wages in violation of the Ohio Prompt Pay Act ("OPPA"), O.R.C. §

4113.15.[1] The "FLSA claims are asserted as a collective action pursuant to 29 U.S.C. § 216(b),

while the Ohio Act claims are asserted individually by the Named Plaintiff and all Ohio Opt-ins."

---

[1] "Courts have uniformly held that Ohio's wage and hour law should be interpreted in accordance with
the FLSA." *Mitchell v. Abercrombie & Fitch, Co.*, 428 F.Supp.2d 725, 732 (S.D. Ohio 2006) (citing
*Douglas v. Argo–Tech Corp.*, 113 F.3d 67 n.2 (6th Cir. 1997)). In addition, both parties analyze
Plaintiff's FLSA, Ohio Wage Act, and OPPA claims under the FLSA. Therefore, the Court will
collectively analyze all of Plaintiff's unpaid overtime claims under the FLSA.

(*See* Compl., ECF No. 1). In addition, Plaintiff asserts individual claims for: (4) racial discrimination in violation of O.R.C. § 4112.02, *et seq.*; and (5) retaliation in violation of O.R.C. § 4112.02(I). (*Id.*). Plaintiffs seek: (1) declaratory judgment, (2) compensatory damages for unpaid overtime compensation, (3) attorneys' fees and costs, (4) injunctive relief, (5) punitive damages, and (6) pre and post-judgment interest. (*Id.*).

On January 24, 2018, the Court granted Plaintiff's Motion to Conditionally Certify the Class. (ECF No. 16). Breck's Paving moved to decertify the conditional class on June 14, 2019. (ECF No. 61). That same day, Breck's Paving moved for summary judgment. (ECF No. 63). Also on June 14, 2019, Breck's Ridge filed a combined motion for summary judgment and motion to decertify the conditional class. (ECF No. 62). Plaintiff filed his Responses in Opposition on July 12, 2019 (ECF Nos. 67, 68, 69, 70), and Defendants replied (ECF Nos. 73 & 74). The parties' motions are ripe for review.

## II.

Initially, the Court will address Defendants' Motions for Summary Judgment. (ECF Nos. 62 & 63).

### A. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56).  When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993).  In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## B.  Claims Against Breck's Ridge

Breck's Ridge moves for summary judgment on all claims.  (ECF No. 62).  First, Breck's Ridge contends that it did not violate the FLSA because "[a]n automatic meal deduction system is lawful," and Plaintiff cannot meet his burden to produce specific evidence that his mealtimes were compensable work.  (BR Mot. for Summ. J. at 14, ECF No. 62).  Second, Breck's Ridge avers that Plaintiff cannot provide direct or indirect evidence of racial discrimination in violation of O.R.C. § 4112.02.  (*Id.* at 9–11).  The Court will consider each argument in turn.

### 1.  Plaintiff's FLSA and Ohio Overtime Claims

The FLSA requires employers to compensate their employees for all hours worked.  29 U.S.C. §§ 206, 207.  The FLSA also mandates that employers compensate employees at a rate not less than time and one-half for work exceeding forty hours per week, *i.e.*, for overtime.  29 U.S.C. § 207(a)(1).  "A claim for non-payment of work during an established mealtime is analytically similar to an unpaid overtime claim."  *White v. Baptist Memorial Health Care Corp.*, 699 F.3d

869, 873 (6th Cir. 2012) (quoting *Hertz v. Woodbury County*, 566 F.3d 775, 783 (8th Cir. 2009)). To prevail on an unpaid overtime claim under the FLSA, a plaintiff must prove four elements: (1) the uncompensated activity constitutes work; (2) the time worked is not *de minimis* and is reasonable in relation to the principal activity; (3) the employer had actual or constructive knowledge of the plaintiff's overtime work; and (4) the amount of time worked. Fair Labor Standards Act of 1938, § 7(a)(1), 29 U.S.C. § 207(a)(1).

"An automatic meal deduction system is lawful under the FLSA." *White*, 699 F.3d at 873; *see generally Hill v. United States*, 751 F.2d 810 (6th Cir. 1984) (U.S. Postal Service's automatic 30 minute lunch deduction system upheld under the FLSA). However, "[t]ime spent predominantly for the employer's benefit during a period, although designated as a lunch period or under any other designation, nevertheless constitutes working time compensable under the provisions of the [FLSA]." *White*, 699 F.3d at 873 (quoting *F.W. Stock & Sons, Inc. v. Thompson*, 194 F.2d 493, 496–497 (6th Cir. 1952)). "If an employer knows or has reason to believe that [a worker] is continuing to work [then] the time is working time." *Id.* (citing 29 C.F.R. § 785.11) (internal citations omitted).

In Breck's Ridge's view, Plaintiff's FLSA claim fails for several reasons. (BR Mot. for Summ. J. at 14–15). First, Breck's Ridge points out that Plaintiff needs more than generalized statements to prove that his lunch periods were spent predominantly for the employer's benefit. (*Id.* at 14) (citing *Haviland v. Catholic Health Industries-Iowa*, 729 F. Supp. 2d 1038 (S.D. Iowa 2010)). Thus, Breck's Ridge argues that Plaintiff cannot prove his missed mealtimes were compensable. (*Id.* at 14). Second, Breck's Ridge contends that it lacked knowledge of Plaintiff's alleged overtime because "he failed to follow the 'NL' notation policy" or complain to Breck's Ridge about his missed breaks. (*Id.* at 15). Finally, Breck's Ridge avers that Plaintiff cannot

satisfy the final prong, i.e., amount of time worked, because he kept no records of the days he worked during lunch.  (*Id.* at 14).

Plaintiff argues there is a genuine dispute of material fact regarding whether his lunch breaks were spent predominantly for Breck's Ridge's benefit.  (Pl.'s Opp'n to BR Mot. for Summ. J. at 11, ECF No. 69).  For instance, Plaintiff states that he "would drive his truck, service vehicle, or skid loader at the site or from one site to another" during his lunch breaks.  (*Id.* at 11–12).  In Plaintiff's view, "[d]riving a vehicle and/or using the materials in the same manner [he] would when [he was] not 'on break' constitutes work done predominantly for the employer's benefit." (*Id.* at 12).  Plaintiff cites *Jones-Turner v. Yellow Enterprise Systems, LLC*, in which the Sixth Circuit found the plaintiffs' lunch breaks were not compensable, but noted "[t]he outcome here would be different if the plaintiffs had introduced evidence that they were required to stay in their trucks or to drive or perform other duties while eating."  597 Fed. App'x 293, 297 (6th Cir. 2015).  Distinguishing *Jones-Turner* from the instant action, Plaintiff avers that he was expected to drive or operate his skid steer during lunch.

Plaintiff further contends that Breck's Ridge had actual or constructive knowledge of his missed lunch breaks.  (*Id.* at 14).  According to Plaintiff, Breck's Ridge admitted that Plaintiff and other hourly employees regularly worked over 40 hours per week when CEO Fissel testified: "for those guys almost always are over 40."  (Fissel Dep. 36:18–24).  Moreover, Plaintiff points out that CEO Fissel admitted actual knowledge of Plaintiff's missed lunch breaks by testifying: "[t]he plaintiff, Garry Parker, was responsible for marking NL on his own timecard, which he did."  (*Id.* at 84:16–25).  Finally, Plaintiff argues "the duty to maintain accurate records under the FLSA is the employer's responsibility."  (Pl.'s Opp'n to BR Mot. for Summ. J. at 18) (citing *Fulkerson v. Yaskawa Am., Inc.*, No. 3:13-cv-130, 2014 WL 4638982, at *6 (S.D. Ohio Sept. 16, 2014)).  Thus,

Plaintiff contends his claim should not be dismissed on summary judgment for failure to keep personal records of his missed lunches.  (*Id.*).

### a.  Compensability of Mealtimes

The Sixth Circuit has held that meals are not compensable work if "the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties and does not spend time predominantly for the employer's benefit."  *Jones-Turner*, 597 Fed. App'x at 296.  In addition, *de minimis* work is not compensable when "the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours."  *Hill*, 751 F.3d at 815.  As Breck's Ridge accurately notes, employees bear the burden of proving their mealtimes are compensable work under the FLSA.  (BR Mot. for Summ. J. at 14) (citing *White*, 699 F.3d at 874).  However, "[t]he Supreme Court has held that the predominant benefit test is 'dependent upon all the circumstances of the case.'"  *Berger v. Cleveland Clinic Foundation*, No. 1:05-cv-1508, 2007 WL 2902907, at *16 (N.D. Ohio Sept. 29, 2007) (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)).  Similarly, the Sixth Circuit has held that compensability should remain "flexible and realistic" and "based on the particular circumstances of [the] case."  *Id.* (quoting *Hill*, 751 F.2d at 814).

Construing the facts in favor of Plaintiff, the Court finds that Plaintiff raises evidence to suggest that he spent his lunch breaks predominantly for Breck's Ridge's benefit—and that such work was not *de minimis*.  As the Sixth Circuit noted in *Jones-Turner*, mealtimes may be compensable where employees are required to drive their trucks while eating.  *Jones-Turner*, 597 Fed. App'x at 297.  In this case, Plaintiff's testimony suggests that employees were expected to drive trucks or operate machinery during lunch to maintain the production schedule.  For instance, Plaintiff testified: "[management] said, well, you need to shut it down and take a lunch, but you

19

can't shut it down and take a lunch when [managers] call you on the radio and say where are you, what's going on." (Pl.'s Dep. 47:15–19). Breck's Ridge contends that Plaintiff's factual assertions are too vague to establish that his lunch breaks were predominately spent for Breck's Ridge's benefit. (BR Mot. for Summ. J. at 14). Accordingly, a genuine dispute of material fact exists as to the compensability of Plaintiff's mealtimes.

### b.  Actual or Constructive Knowledge

"Under the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." *White*, 699 F.3d at 876 (citing *Hertz*, 566 F.3d at 780). In this case, Plaintiff raises a genuine dispute of material fact over whether he was instructed or permitted to report his missed lunches. For example, when asked if he was ever instructed to mark his timecard with NL, Plaintiff testified: "No. But we did it sometimes just to see if we would get paid for it." (Pl.'s Dep. 44:2–6).

Moreover, Plaintiff testified "[Breck's Ridge Management] all knew we weren't getting a full lunch. We didn't have time for that. We had to keep the production going. That's all that really mattered, production. (*Id.* at 44:20–24). In contrast, Breck's Ridge maintains that the "NL" policy was clearly communicated to employees. (BR Reply at 11, ECF No. 73). Breck's Ridge further contends that "[w]hen no lunch was reported, the employee was paid" and that the "NL" policy does not establish "constructive knowledge that employees were regularly working through their meal periods." (*Id.* at 12 & 10). Accordingly, a genuine dispute of material fact exists as to whether Breck's Ridge had actual or constructive knowledge of Plaintiff's missed lunch breaks.

### c.  Amount of Time Worked

In Breck's Ridge's view, Plaintiff presents insufficient evidence to support the contention that he always missed lunch.  (BR Mot. for Summ. J. at 14).  Breck's Ridge maintains that "not one of the Plaintiffs could point to a single day where they did not take their lunch, instead testifying that they usually or often were too busy to take lunch and ate 'on the go.'" (*Id.*).  On the other hand, Plaintiff testified that he "always didn't have time for [lunch]."  (Pl.'s Dep. 43:1–8).  Relying on *Berger v. Cleveland Clinic Foundation*, Plaintiff points out that "[r]ecovery under the FLSA should not be denied because proof of the number of hours worked is inexact or not perfectly accurate."  No. 1:05-cv-1508, 2007 WL 2902907, at *15 (N.D. Ohio Sept. 29, 2007).  In *Berger*, the plaintiff estimated that his lunch breaks were interrupted 12.5 to 30 percent of the time.  *Id.* at 15.  Although the court noted that the plaintiff's evidence of "uncompensated interrupted lunches . . . [was] borderline," it held that "issues of credibility that this case presents must be dealt with at trial, not on summary judgment."  *Id.* at *15.

The Court finds *Berger* instructive.  Besides the testimony of Plaintiff, Mr. Burrell, and Mr. Howard, Plaintiff provides no evidence to support the claim that he "always" worked through lunch.  However, the Court declines to weigh the credibility of the parties at summary judgment.  Because a genuine dispute of material fact exists as to the amount of time worked, Plaintiff's FLSA claim must survive.  The Court **DENIES** Breck's Ridge's Motion for Summary Judgment with respect to Plaintiff's FLSA, Ohio Wage Act, and OPPA claims.

### 2.  Plaintiff's Racial Discrimination Claims

Plaintiff brings racial discrimination claims under O.R.C. § 4112.02, averring that he suffered disparate treatment, a hostile work environment, and retaliation while employed at Breck's Ridge.  (*See generally* Compl.).  O.R.C. § 4112.02 provides, in pertinent part:

> It shall be an unlawful discriminatory practice:
>
> (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

O.R.C. § 4112.02. "Ohio courts apply federal case law interpreting Title VII of the Civil Rights Act of 1964 to claims arising under R.C. Chapter 4112." *Pitts-Baad v. Valvoline Instant Oil Change*, No. 2012 CA 00028, 2012 WL 4946433, at *4 (Ohio Ct. App. Oct. 15, 2012) (citing *Genaro v. Cent. Transport, Inc.*, 84 Ohio St. 3d 293, 298 (1999)).

### a. Disparate Treatment

Disparate treatment occurs when an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Broth. of Teamsters v. United States*, 431 U.S. 324, 374 n.15 (1977). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* To prevail in a disparate treatment claim, the plaintiff must either present direct evidence of discrimination or rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–803 (1973). *Jones v. St. Jude Medical S.C., Inc.*, 823 F. Supp. 2d 699, 721 (S.D. Ohio 2011).

Here, Plaintiff argues that Mr. Imer's derogatory statements constitute direct evidence of discrimination. (Pl.'s Opp'n to BR Mot. for Summ. J. at 32). Specifically, Plaintiff cites Mr. Imer's comments that: (1) Plaintiff belongs in "Nigger Creek" like the "rest of them" (referring to African Americans); (2) black people should be respectful to white people because of the Ku Klux Klan, (3) black people should address Mr. Imer with "yes, sir;" (4) black people like Plaintiff should not be in managerial roles; and (5) and Mr. Imer was going to "get rid of [Plaintiff] because

[Plaintiff is] black and nothing but a problem." (*Id.* at 32–33).[2]  Relying on these statements, Plaintiff contends that Mr. Imer "revealed his discriminatory animus and [that] his decision to terminate Plaintiff was substantially motivated by race/color discrimination." (*Id.* at 32).  In addition, Plaintiff points out that Mr. Imer was directly involved in the decision-making process not to rehire him.  (*Id.* at 33) (citing CEO Fissel Dep. 98:2–5).

Breck's Ridge maintains that Plaintiff cannot prove disparate treatment through direct evidence, arguing that Plaintiff cannot show a direct correlation between Mr. Imer's comments and Breck's Ridge's decision not to rehire him.  (BR Mot. for Summ. J. at 9–10).  For example, Breck's Ridge points out that "[c]ontrary to Plaintiff's characterization, there were no discriminatory comments during the telephone call [informing Plaintiff he had not been rehired]." (BR Reply at 5).  Furthermore, Breck's Ridge argues "there is no evidence that the decision maker with the ultimate authority, Mr. Fissel, had any knowledge of [Mr. Imer's] comments since Plaintiff never informed him or anyone else at the company."  (BR Mot. for Summ. J. at 11).

Breck's Ridge's arguments are not well taken.  Direct evidence exists where the plaintiff provides credible evidence that "unlawful discrimination was *at least a motivating factor* in the employer's actions."  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.

---

[2]  The Court notes that several of Plaintiff's asserted incidents are not supported by the record. Examining the cited portions of Plaintiff's deposition, the Court does not find references to: (1) the Ku Klux Klan, (2) Mr. Imer instructing Plaintiff to address him as "yes, sir," or (3) Mr. Imer stating he was going to "get rid of [Plaintiff] because [Plaintiff is] black and nothing but a problem."  In *Guarino v. Brookfield Township Trustees*, the Supreme Court held that "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies."  980 F.2d 399, 405 (6th Cir. 1992); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("[a] district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through . . . the entire record for some specific facts that might support the nonmoving party's claim").  Accordingly, the Court will only consider the facts properly cited in the record.

1999) (emphasis added)).  "Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination."  *Jacklyn*, 176 F.3d at 926.

The Sixth Circuit has held that "[r]acial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence."  *Erin v. Potter*, 79 Fed. App'x 893, 897 (6th Cir. 2003).  For example, in *Talley v. Bravo Pitino Restaurant, Ltd.*, the Sixth Circuit found credible "direct evidence that plaintiff's termination may have been racially motivated" where witness affidavits provided evidence that the plaintiff's manager "occasionally made disparaging comments about blacks."  61 F.3d 1241, 1249–1250 (6th Cir. 1995) (reversed on other grounds); citing *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985) ("racial slurs made by a manager were direct evidence of discrimination sufficient to get the plaintiff's case to the jury"); *see also Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) (defendant's statement that "America won't allow a nigger president" constituted direct evidence of discriminatory intent).

The Court finds Mr. Imer's alleged comments are indicative of a discriminatory animus.  Not only did Plaintiff present evidence that Mr. Imer used racist language, the record indicates that Mr. Imer threatened Plaintiff's position as foreman on account of his race.[3]  Moreover, the Court is unpersuaded by Breck's Ridge's argument that Mr. Imer's remarks cannot constitute direct evidence of discrimination because Mr. Imer was not the ultimate decision-maker regarding Plaintiff's employment.  "Discriminatory statements must come from decisionmakers to constitute [direct] evidence of discrimination."  *Geiger v. Tower Auto.*, 579 F.3d 614, 620–621 (6th Cir.

---

[3]  Plaintiff testified: "[Mr. Imer] said that a black person should not be in a supervisory position, I should not be in a supervisory position, there's no reason that I should be there, he would make sure that I didn't stay there, and he did it."  (Pl.'s Dep. 16:12–20).

2009). However, CEO Fissel testified that Mr. Imer was involved in the decision not to re-hire Plaintiff. (CEO Fissel Dep. 98:2–5). In fact, CEO Fissel framed the decision-making process as a joint effort between himself, Mr. Imer, and Mr. Justus, testifying that "we decided that we were not going to hire [Plaintiff]." (CEO Fissel Dep. 92:2–5).

Even assuming that CEO Fissel made the ultimate employment decision, Plaintiff could potentially recover under a cat's paw theory of liability. Under this theory, "Plaintiff must show that by relying on [a] discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw." *Chattman*, 686 F.3d at 350 (internal citations omitted). In *Staub v. Proctor Hospital*, the Supreme Court clarified the cat's paw theory, holding that "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable." 562 U.S. 411, 422 (2011). Accordingly, Plaintiff must establish a genuine dispute of material fact as to: (1) Mr. Imer's intent, and (2) the causal link between Mr. Imer's discriminatory animus and Breck's Ridge's employment decision.

The Court finds he did so. Mr. Imer's comment that he "would make sure that [Plaintiff] didn't stay [in a foreman role]" is indicative of Mr. Imer's intent to prevent Plaintiff from being re-hired. In addition, Mr. Imer's involvement in hiring discussions with CEO Fissel raises a genuine issue of material fact as to whether a causal link exists between Mr. Imer's discriminatory animus and Plaintiff's adverse employment action. *See Chattman*, 686 F.3d at 353 (finding a genuine issue of fact as to causation under *Staub* because a supervisor with discriminatory animus was "involved in some parts of the discussion" regarding the plaintiff's discipline and non-promotion).

25

Because Plaintiff presented evidence of Mr. Imer's discriminatory animus and asserted sufficient proof of a genuine issue of material fact as to intent and causation under *Staub*, summary judgment would be improper. Whether Mr. Imer's discriminatory animus was a motivating factor in Breck's Ridge's decision not to re-hire Plaintiff is a matter to be resolved by a jury. Accordingly, the Court **DENIES** Breck's Ridge's Motion for Summary Judgment with respect to Plaintiff's disparate treatment claim.

### b. Hostile Work Environment

"The *McDonnell Douglas* burden-shifting approach also applies to hostile-work-environment claims." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). To establish a *prima facie* case for hostile work environment, Plaintiff must demonstrate that: "(1) he belonged to a protected group, (2) he was subject to unwelcome harassment, (3) the harassment was based on [his] race, [color, and sex,] (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078–79 (6th Cir. 1999)) (footnote omitted).

This test "has both objective and subjective components." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999); *see also Wade v. Automation Personnel Servs., Inc.*, 612 F. App'x 291, 296 (6th Cir. 2015) ("The conduct must be objectively hostile or abusive, and the victim must also subjectively regard the environment as abusive.") (citing *Knox v. Neaton Auto Prods. Mfg.*, 375 F3d 451, 459 (6th Cir. 2004); *see also Harris*, 510 U.S. at 21–22). Further, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause

of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams*, 187 F.3d at 562 (emphasis in original).

Plaintiff contends that Breck's Ridge subjected him to various disparaging comments during his employment, including:

> (1) Imer told Plaintiff he belongs in "nigger creek" (referencing a creek Imer visited in Gatlinburg, TN) like the "rest of them" (referring to black people); (2) Imer told Plaintiff that black people are respectful to white people because of the Ku Klux Klan; (3) Imer told Plaintiff that he should address Imer with "yes, sir" like the black people do in "nigger creek[;]" (4) Imer told Plaintiff that black people should not be in managerial positions; and (5) Imer told Plaintiff that he was going to "get rid of you because you are black and nothing but a problem."

(Pl.'s Opp'n to BR Mot. for Summ. J. at 32–33) (citing Pl.'s Dep.).[4]  In Plaintiff's view, these remarks created a hostile work environment in violation of O.R.C. § 4112.02.  (Compl. ¶ 88).  Breck's Ridge does not discuss Plaintiff's hostile work environment claim, instead focusing on allegations of disparate treatment and retaliation.  (BR Mot. for Summ. J. at 9–13).

Breck's Ridge appears to concede there is no genuine issue of material fact for the first three elements of Plaintiff's hostile work environment claim. There is, however, disagreement between the parties concerning the last two elements. Nevertheless, construing the facts in Plaintiff's favor, the Court concludes that Plaintiff has presented a genuine dispute as to whether he established a *prima facie* case for a hostile work environment claim.

To satisfy the fourth prong of a *prima facie* case for a hostile work environment claim, Plaintiff must present evidence showing the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" under the totality of the circumstances.  *Clay*, 501 F.3d at 707 (quoting *Williams*, 187 F.3d at 562).

---

[4]  As noted *supra*, Plaintiff's cited evidence only supports his first and fourth listed factual assertions. Therefore, the Court will only consider these factual assertions.

In *Smith v. Leggett Wire Co.*, the Sixth Circuit held that the plaintiff's supervisor's use of the "N" word several times, the circulation of a "racially discriminatory and lewd cartoon," and a foreman's reference to a black employee as a "gorilla" did not collectively rise to the level of "'severe or pervasive enough' to create an objectively hostile work environment."  220 F.3d 757, 760 (6th Cir. 2000).  Similarly, in *Nicholson v. City of Clarksville, Tennessee*, the Sixth Circuit did not find severe or pervasive conduct where the Court identified "four instances of racial slurs between the years 2007 and 2009."  530 Fed. App'x 434, 443 (6th Cir. 2013).  The slurs included the use of the N-word, as well as references to African American employees as blue-skinned.  *Id.* Finally, in *Armstrong v. Whirlpool Corp.*, the Sixth Circuit affirmed the district court's grant of summary judgment on a hostile work environment claim involving "a handful of uses of the n-word and its derivatives, . . . some racist jokes . . . , a few references . . . to the Ku Klux Klan and James Earl Ray, and the presence of racist graffiti that was removed as soon as [the plaintiff] reported it to a supervisor."  363 Fed. App'x 317, 327 (6th Cir. 2010).

Unlike *Smith*, *Nicholson*, and *Armstrong,* where the inappropriate conduct in the work environment amounted to insults and racial slurs, the harassment Plaintiff endured in the instant case exceeded the bounds of juvenile verbiage and entered the realm of physical threats and financial sabotage. The use of the N-word at Breck's Ridge was similar to the conduct described in *Smith*, *Nicholson*, and *Armstrong*, but unfortunately the inappropriate and offensive conduct did not stop there. Breck's Ridge allowed its employee, Mr. Imer, to engage in conduct that included both racist language and the threat or suggestion of mortal violence against Plaintiff based on race. Moreover, Mr. Imer acted to sabotage Plaintiff economically. These are not the same circumstances that were present in *Smith, Nicholson,* and *Armstrong*.

In his deposition, Plaintiff testified that Mr. Imer used racially derogatory remarks on three separate occasions to bolster his assertions that black employees should not receive managerial roles. (Pl.'s Dep. 24:1–25:2 & 16:12–20). During the first incident, Plaintiff testified that Mr. Imer mentioned a creek he encountered on vacation, and that he said all disrespectful N-words belonged in the creek. (Pl.'s Dep. 24:3–8). During the second incident, Plaintiff testified that Mr. Imer told him black people should not be in charge and that they all belonged in the creek. (Pl.'s Dep. 24:21–25:2). If credited by a jury, these remarks would serve a dual purpose. On the one hand, they send the message that black people should subordinate themselves to white people, especially in the workplace. And on the other, they communicate that if Plaintiff is insubordinate or disrespectful, then he could end up "in the river." Plaintiff testified that his racially charged interactions with Mr. Imer continued beyond these overtly racist threats.

Plaintiff revealed during deposition that Mr. Imer accused him of stealing, among other things, an AR-15 rifle. (Pl.'s Dep. 19:7–20:21). Plaintiff also testified that Mr. Imer levied this accusation against him based on nothing more than his race. (*Id.*). Further, Plaintiff stated during deposition that Mr. Imer and his brother confronted Plaintiff about the rifle and threatened him with bodily harm. (*Id.*). Not only did Plaintiff testify that Mr. Imer physically threatened him, he also testified that Breck's Ridge sabotaged him economically because of his race.

Plaintiff stated during deposition that he did not get the same bonus all the other white supervisors got, on account of his race. (Pl.'s Dep. 15:22–17:25). Plaintiff also testified that CEO Fissel left the bonus decisions to two supervisors, one of whom was Mr. Imer. (Pl.'s Dep. 41:7–17). Further, Plaintiff stated during deposition that, on a third occasion, Mr. Imer threatened Plaintiff's employment as a foreman on racial grounds stating "a black person should not be in a supervisory position" and that he would "make sure that [Plaintiff] didn't stay there, and he did . .

. .” (Pl.'s Dep. 16:12–20). Moreover, as CEO Fissel testified, Mr. Imer shared in the decision not to rehire Plaintiff. (Fissel Dep. 105:5–11). And as Plaintiff testified, it was ultimately Mr. Imer who called to terminate him. (Pl.'s Dep. 53:16–25).

Taking this information into account, the harassment in this case is not analogous to *Smith, Nicholson,* and *Armstrong,* and the Court therefore finds that Plaintiff has presented a genuine issue of material fact as to whether the harassment was sufficiently severe or pervasive as to alter the conditions of his employment and create an abusive working environment.

To satisfy the fifth prong of a *prima facie* case for a hostile work environment claim, Plaintiff must present evidence that Breck's Ridge knew or should have known about the harassment and failed to act. Plaintiff testified that he never reported Mr. Imer's harassment to anyone else at the company. (Pl.'s Dep. 21:23–25 & 22:4–9). However, the record shows no indication that there was a policy or procedure in place to allow Plaintiff to do so. Even in the absence of such a policy or procedure, Plaintiff's harassment was at least known to Mr. Imer. This is important because Mr. Imer, as co-manager of Breck's Ridge, was required to manage the office and sales. As the primary manager of the office, Mr. Imer's alleged knowledge of the harassment was, in effect, the company's knowledge, especially given the extent to which Mr. Imer participated in "upper management." (Pl.'s Dep. 54:5-15). Taking this information into account, the Court finds that Plaintiff has presented a genuine question as to whether Breck's Ridge knew or should have known about the harassment and failed to act.

Because Plaintiff meets his *prima facie* burden, the Court **DENIES** Breck's Ridge's Motion for Summary Judgment on Plaintiff's hostile work environment claim.

### c. Retaliation

O.R.C. § 4112.02 makes it unlawful:

> [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.02 to 4112.07 of the Revised Code.

(O.R.C. § 4112.02). "The elements required to establish retaliation under O.R.C. § 4112.02 are identical to those required to establish such a claim under Title VII." *Smith v. Board of Trustees Lakeland Community College*, 764 F. Supp. 2d 877, 900 (N.D. Ohio 2010) (citing *Dalton v. Jefferson Smurfit Corp.*, 979 F. Supp. 1187, 1200 (S.D. Ohio 1997)). Thus, retaliation claims based on indirect evidence are subject to the *McDonnell Douglas* burden-shifting framework. *Mansfield v. City of Murfreesboro*, 706 Fed. App'x 231, 236 (6th Cir. 2017).

In order to establish a *prima facie* case of retaliation, Plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) Breck's Ridge knew of this exercise of protected rights; (3) Breck's Ridge took an action that was "materially adverse" to Plaintiff; and (4) there is a causal connection between the protected activity and the materially adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). Here, there is no evidence suggesting that Plaintiff openly opposed Mr. Imer's discriminatory actions. Nor is there any evidence indicating that Plaintiff "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.02" of the Ohio Revised Code. O.R.C. § 4112.02. In fact, Plaintiff testified that he did not report Mr. Imer's remarks to anyone at Breck's Ridge. (Pl.'s Dep. 22:4–9). Consequently, Plaintiff cannot establish the first prong of a *prima facie* case for retaliation, i.e., that he engaged in a protected activity. As a result, the Court **GRANTS** Breck's Ridge's Motion for Summary Judgment on Plaintiff's retaliation claim.

**C.  Claims Against Breck's Paving**

Breck's Paving also moves for summary judgment on all claims.  (ECF No. 63).  First, Breck's Paving argues that Plaintiff's "FLSA claims fail as a matter of law because Breck's Paving, Inc., had no actual or constructive knowledge of [Plaintiff's] unpaid overtime work during the 30 minute break."  (BP Mot. for Summ. J. at 2, ECF No. 63).  Second, Breck's Paving contends that Plaintiff's discrimination claims fail at summary judgment because Plaintiff testified that "no one racially discriminated or retaliated against him while he was employed by Breck's Paving." (*Id.* at 3).

**1.  Plaintiff's FLSA and Ohio Overtime Claims**

As noted *supra*, Plaintiff must prove the following elements to succeed on his FLSA claim for unpaid overtime: (1) the uncompensated activity constitutes work; (2) the time worked is not *de minimis* and is reasonable in relation to the principal activity; (3) the employer had actual or constructive knowledge of the plaintiff's overtime work; and (4) the amount of time worked.  Fair Labor Standards Act of 1938, § 7(a)(1), 29 U.S.C. § 207(a)(1).

In the instant action, Breck's Paving avers that Plaintiff cannot satisfy the third element of his *prima facie* case because Plaintiff "did not follow Breck's [Paving's] reasonable process for an employee to report uncompensated work time."  (BP Mot. for Summ. J. at 8).  Citing case law from several circuits, Breck's Paving asserts that where an employer establishes a reasonable process for reporting overtime, the employer is not liable under the FLSA if the employee fails to follow that process.  (*Id.* at 9–10) (citing *White*, 699 F.3d at 876; *Hertz*, 566 F.3d at 783; *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)).

For instance, in *Newton*, the plaintiff a was police officer who worked in the field as part of a DEA task force.  47 F.3d at 749–750.  Although the employer maintained specific procedures for reporting overtime, the plaintiff failed to follow those procedures.  *Id.*  The Fifth Circuit noted that: "[i]f we were to hold that the [employer] had constructive knowledge that [the plaintiff] was working overtime . . . we would essentially be stating that the [defendant] did not have the right to require an employee to adhere to its procedures for claiming overtime.  *Id.*  Accordingly, the Fifth Circuit found the defendant did not have actual or constructive knowledge of the plaintiff's overtime work.  *Id.*

Analyzing *Newton* to the present facts, Breck's Paving points out that Plaintiff worked in the field and was permitted to take his 30 minute lunch break at his discretion.  (BP Mot. for Summ. J. at 11).  In addition, Breck's Paving avers that it maintained a method of reporting compensable mealtimes, i.e. marking timecards with "NL."  (*Id.*; BP Reply at 24–26, ECF No. 74).  Breck's Paving points to VP Bloxam's deposition, in which she testified as follows:

> Q.  And so how would you know [of missed lunches]?  How would you know if it was work related or not work related?
>
> A.  If I took the—they would come in and they would put "no lunch" if [the employees], for some reason, didn't get to finish their lunch that day or didn't get their half hour in.
>
> Q.  Okay.  So your testimony today is that if they did not get a lunch, they would write that on the card?  That's your—that's your policy?
>
> A.  Right.  And that—And then it would be initialed by your foreman.

(BP Reply at 24) (citing VP Bloxam Dep. 115:2–12).  Breck's Paving also highlights CEO Bloxam's deposition testimony that: "[N/L] was the exception.  If you wrote 'NL' on [the time card] without your supervisor's signature, it meant nothing.  If you had 'NL' on your time card with your supervisor's signature, saying, 'Yeah, you worked through lunch.  You need to be paid,'

then it was credited and paid."  (CEO Bloxam Dep. 20:7–12, ECF No. 66-17).  Thus, Breck's Paving argues it had no way of knowing whether Plaintiff worked during his lunch break absent one of the established reporting measures.

Plaintiff contends there is a genuine dispute of material fact regarding Breck's Paving's actual or constructive knowledge of his uncompensated lunch breaks.  (Pl.'s Opp'n to BP Mot. for Summ. J. at 4–5).  First, Plaintiff argues "the record reflects that there [was] no written policy in place for reporting missed and interrupted lunches."  (*Id.* at 6).  Plaintiff cites VP Bloxam's disposition, in which she testified:

> Q.  Is there anything in that section . . . [or] other section in this company handbook—that says or explains or outlines any policy or procedure of reporting when an individual does not get a fully uninterrupted meal period of 30 minutes? . . .
>
> A.  No, because it's my feeling that if I put down the exception, that you would be paid, that it would be taken more advantage of.  And you have to understand the majority, if not all these guys, had worked for Breck's Paving for, some of them, ten, fifteen, twenty years.  So could—did I make an assumption that they knew that?  Absolutely.

(VP Bloxam Dep. 131:9–22).

Second, Plaintiff points out that VP Bloxam was aware of at least some of his missed lunches.  (*Id.* at 19).  Plaintiff points to VP Bloxam's testimony that Plaintiff's timecards were marked "NL" a total of 32 times over a two-year period.  (Bloxam Aff. ¶ 15).  In addition, Plaintiff testified that VP Bloxam approached him when she noticed a "NL" marked on his time card.  (Pl.'s Dep. 99:2–8).  Specifically, Plaintiff testified: "[VP Bloxam] said what is this ["NL"], Garry, I told you, you need to take a lunch, and I said, well, I didn't have time for a lunch.  So that's pretty much how the conversation went."  (*Id.*).  Accordingly, Plaintiff argues that "Breck's Paving was aware when Plaintiff worked through lunch, at a minimum, when the "NL" notations appeared on his time card."  (Pl.'s Opp'n to BP Mot. for Summ. J. at 19).

Plaintiff's arguments are well taken.  Because a factual dispute exists regarding the third prong of Plaintiff's *prima facie* case under the FLSA, summary judgment is not appropriate. Consequently, the Court **DENIES** Breck's Paving's Motion for Summary Judgment on Plaintiff's FLSA, Ohio Wage Act, and OPPA claims.

### 2. Plaintiff's Racial Discrimination Claims

In Breck's Paving's view, Plaintiff's racial discrimination claims fail as a matter of law because Plaintiff admitted he never felt discriminated against while employed at Breck's Paving. (BP Mot. for Summ. J. at 21–22).  As Breck's Paving points out, Plaintiff testified:

> Q.  All right.  So for purposes of moving forward from this point forward, is there any issue that you have with Breck's Paving or Kevin [Bloxam] or Barb Bloxam with respect to racial discrimination?
>
> A.  Oh, no, no, no, no.  I know all his grandkids, his children, no, not at all.
>
> Q.  Okay.  Did you ever feel discriminated against because of your race with Breck's Paving, Incorporated?
>
> A.  Never with Kevin [Bloxam].
>
> Q.  Did you suffer any negative employment consequences, like a discipline or a deduction in pay?
>
> A.  No, never.

(Pl.'s Dep. 78:24–79:13).  Plaintiff does not address his racial discrimination claims against Breck's Paving in his Response in Opposition.  (*See* Pl.'s Opp'n to BP Mot. for Summ. J.).

This Court agrees with Breck's Paving.  Plaintiff fails to establish a genuine dispute of material fact that he was discriminated against based on his race while employed by Breck's Paving.  Accordingly, the Court **GRANTS** Breck's Paving Motion for Summary Judgment on Plaintiff's racial discrimination claims.

**III.**

Next, the Court considers Defendants' Motions to Decertify the Conditional Class. (ECF

Nos. 61 & 62).

**A. Legal Standard**

The FLSA provides a private cause of action against an employer "by any one or more

employees for and in behalf of himself or themselves and other employees similarly situated" for

violations of FLSA's wage and hours provisions. 29 U.S.C. § 216(b). Collective actions brought

by employees under FLSA require putative class members to opt into the action by giving their

"consent in writing to become such a party," and are generally termed the "opt-in Plaintiffs." *Id.*

The statutory standard for bringing a collective action under FLSA is that the opt-in plaintiffs are

"similarly situated" to the lead plaintiffs. *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584

(6th Cir. 2009); *see also Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL

6662919, at *1–2 (S.D. Ohio Nov. 2, 2015).

Courts in the Sixth Circuit follow a two-stage certification process to determine whether

the plaintiffs in a proposed group are "similarly situated." *Comer v. Wal–Mart Stores, Inc.*, 454

F.3d 544, 545–546 (6th Cir. 2006); *see also Castillo v. Morales, Inc.*, 302 F.R.D. 480, 483 (S.D.

Ohio 2014). The first, or "notice" stage, takes place at the beginning of discovery with a focus on

determining whether there are plausible grounds for plaintiffs' claims. Named plaintiffs need only

provide a "modest factual showing" to demonstrate that they are similarly situated to the proposed

co-plaintiffs, and the court's review of this modest showing "is made using a fairly lenient

standard," which "typically results in 'conditional certification' of a representative class." *Id*. at

547. "After notice has been sent and discovery has been completed, the defendant can file a motion

36

for decertification, challenging the court's preliminary determination that other employees are similarly situated." *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865 (S.D. Ohio 2005).

The second review requires the district court to "examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer*, 454 F.3d at 547. "At this point, the court considers all the evidence . . . to determine whether the assembled class may continue as a collective action or whether the putative class should be decertified, leaving plaintiffs free to pursue their claims individually." *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 851 (N.D. Ohio 2013). "The FLSA does not explicitly define the term 'similarly situated,' and neither has the Sixth Circuit." *Castillo*, 302 F.R.D. at 483; *see also Wade v. Werner Trucking Co.*, No. 2:10-CV-00270, 2012 WL 5378311, at *4 (S.D. Ohio Oct. 31, 2012).

However, factors to consider include: (1) "the factual and employment settings" of the plaintiffs, (2) possible defenses available to the plaintiffs, and (3) the "degree of fairness and procedural impact of certifying the action as a collective action." *O'Brien*, 575 F.3d at 584; *see also* 7B Wright, Miller, & Kane, *Federal Practice and Procedure* § 1807 n. 65 at 497 (3d ed. 2005). Moreover, "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all plaintiffs." *Id.* Notably, plaintiffs who show their claims are "unified by common theories of defendants' statutory violations" are similarly situated "even if the proofs of these theories are inevitably individualized and distinct." *Id.* at 585. "If claimants are not similarly situated, . . . the court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice." *Frye v. Baptist Memorial Hospital, Inc.*, No. CIV.07-2708, 2010 WL 3862591, at *3 (W.D. Tenn. Sept. 27, 2010).

**B.  Analysis of FLSA Class Certification**

Breck's Ridge contends the putative class should be decertified for two reasons. First, Breck's Ridge maintains that "Plaintiff's claims should be dismissed pursuant to this summary judgment motion leaving the class without a representative." (BR Mot. for Summ. J. at 16–17). Second, Breck's Ridge claims that Plaintiff was laid-off in 2016, prior to the company's implementation of a paperless time-keeping system which rendered the practice of marking timecards with "NL" obsolete. (*Id.* at 17). In contrast, Breck's Ridge states that Mr. Burrell and Mr. Howard were employed in 2017, after "the new system, policies and practices were implemented." (*Id.* at 18).[5] As a result, Breck's Ridge contends the putative class members are not similarly situated because Plaintiff "was not subject to the same time keeping practices that the opt-in plaintiffs were required to use." (BR Reply at 15). Breck's Paving avers the conditionally certified class should be decertified because Mr. Burrell and Mr. Howard never worked for Breck's Paving—only Breck's Ridge. (BP Mot. for Decert. at 3, ECF No. 61).

Plaintiff does not oppose Breck's Paving's Motion to Decertify the Conditional Class to the extent that it only affects certification with respect to Breck's Paving. (Pl.'s Opp'n to BP Mot. for Decert. at 1–2, ECF No. 67). Specifically, Plaintiff conditions his stipulation on the premise that "**[Plaintiff's] claim for unpaid overtime against Defendant Breck's Paving, Inc. will persist and the FLSA collective of [Plaintiff], Burrell, and Howard will remain certified against Breck's Ridge, LLC.**" (*Id.*) (emphasis in original). However, Plaintiff avers that Breck's Ridge's Motion to Decertify the Conditional Class should be "denied in its entirety." (Pl.'s Opp'n to BR Mot. for Decert. at 1, ECF No. 686). In Plaintiff's view, the *O'Brien* factors all weigh against decertification. (*Id.* at 6). The Court will analyze each factor in turn.

### 1. Factual and Employment Settings

---

[5] Breck's Ridge notes that "Mr. Howard worked less than one month in 2016 and never had enough hours to qualify for overtime." (BR Mot. for Summ. J. at 18).

According to Plaintiff, the factual setting of his employment remained the same after Breck's Ridge purchased Breck's Paving.  (*Id.* at 7).  Specifically, Plaintiff notes: "(1) [Breck's Ridge's] single, Columbus, Ohio worksite is still at 1367 Frank Rd.; (2) the job classifications [remain the same]; (3) it remains a paving company; (4) still provides the same services since the mid 1900's under the same name; (5) same equipment; (6) same machinery; and (7) same production methods."  (*Id.*).  In addition, Plaintiff states that he, Mr. Burrell, and Mr. Howard, were all "hourly, non-exempt, employees" who worked at the Columbus, Ohio facility as manual laborers.  (*Id.* at 7–8).

Aside from switching to paperless time-keeping, Plaintiff asserts that nothing about Breck's Ridge's lunch break policy changed in 2017.  (*Id.*).  In Plaintiff's view, marking "'NL' on timecards was never a policy or practice, and, regardless, Plaintiff . . . was not compensated for the lunches that had been marked as 'NL.'"  (*Id.* at 9).  Furthermore, Plaintiff points out that Breck's Ridge purchased Breck's Paving in April 2016, and that he was employed with Breck's Ridge through March 2017.  (*Id.* at 8) (citing Fissel Dep. 29:11–17; 96:23–97:3).  Accordingly, Plaintiff rejects Breck's Ridge's argument that he was laid-off in 2016, prior to Mr. Howard and Mr. Burrell's employment.  Plaintiff additionally argues that "since the policy of not getting paid for [worked lunch] time continued after Plaintiff's employment ended, the opt-in class members were still subject to the same FLSA-violating policy."  (*Id.* at 9).

Plaintiff's arguments are well taken.  "Standing alone, an employer policy providing automatic deductions for meal breaks does not violate the FLSA."  *Frye*, 2010 WL 3862591, at *5 (W.D. Tenn. Sept. 27, 2010); *see also White*, 699 F.3d at 873.  In *Frye v. Baptist Memorial Hospital, Inc.*, the Sixth Circuit upheld the district court's decision to decertify the conditional class.  495 Fed. App'x 669, 670 (6th Cir. 2012).  The *Frye* court noted the "varied job duties of

the opt-in plaintiffs, even within a department, and the different 'exception procedures' of varying formality used to ensure compensation for work performed during meal breaks (e.g., exception logs, notes to supervisors)" weighed against a finding of similarly situated plaintiffs.  *Id.*  In addition, the *Frye* court found that the plaintiff "failed to rebut [the defendant's] formal policy of compensating for all time worked with evidence of a '*de facto* policy to the contrary.'"  *Id.* Specifically, the Sixth Circuit stated that "many of the opt-in plaintiffs testified that [defendant] paid them for time claimed via the exception procedures, and that it did not discourage them or retaliate against them for using the exception procedures."  *Id.*

    *Frye* is distinguishable from the instant action.  Although Breck's Ridge accurately notes that the switch to an electronic time-keeping system prevented the opt-in plaintiffs from marking timecards with "NL," it fails to rebut Plaintiff's argument that Breck's Ridge had a *de facto* policy of never compensating employees for missed lunches.  CEO Fissel testified there was no written policy regarding how to report a missed or interrupted lunch break.  (*Id.* at 57:14–20).  In fact, Breck's Ridge's Company Policy Book dated August 31, 2016 indicated "[t]here will be no exception to the [automatic deduction] policy."  (BR Exhibit 2, ECF No. 56-3).  The same language is present in Breck's Ridge's Company Policy Book dated May 23, 2017.  (BR Exhibit 2, ECF, No. 57-3).

    Most importantly, Plaintiff, Mr. Howard, and Mr. Burrell all testified that they were never paid for missed lunches, despite Breck's Ridge's knowledge of their worked time.  Plaintiff testified that he was never compensated for lunches even when he marked his timecard "NL," and that everyone at Breck's Ridge "knew we weren't getting a full lunch."  (Pl.'s Dep. 44:2–24).  Mr. Burrell testified "it was told to me that [Breck's Ridge] was going to take [your 30 minutes] no

matter what, like, out of your money," and that no one ever instructed him to report uncompensated

lunch time.  (Burrell Dep. 22:17–19; 23:11–16).  Finally, Mr. Howard testified as follows:

> Q.  Did anybody ever tell you that [you] couldn't take your lunch?
>
> A.  Yeah, I mean, [management] would tell you that they . . . you had to be doing what they—what you were told to do.  I mean, so basically you were told that you didn't have time for a lunch break.
>
> Q.  And who told you that?
>
> A.  I mean, they didn't come right out and say you can't have a lunch break, but they more or less told you this is urgent, you have blacktop coming.

(Howard Dep. 14:17–15:2).

The Court finds this evidence sufficient to establish a "unified policy of violations at this

stage of the proceeding." *Frye*, 2010 WL 3862591, at *6.  In other words, Plaintiff and the opt-in

plaintiffs have shown their claims stem from a single FLSA-violating policy to never compensate

employees for missed lunches.  As noted *supra*, certification is not inappropriate where, as here,

each putative class member offers proof of the illicit policy through "individualized" evidence.

*O'Brien*, 575 F.3d at 585.  Accordingly, the first *O'Brien* factor weighs against decertification.

### 2.  Possible Defenses Available

Next, the Court "must assess the defenses available to [Breck's Ridge] and determine

whether they are individualized as to each Plaintiff or can be asserted more broadly against a

class." *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 856 (N.D. Ohio 2013) (citing *Frye*,

2010 WL 3862591, at *8–9).  "Where plaintiffs' factual and employment settings are similar, these

defenses do not necessarily render collective treatment unmanageable." *Id.* (quoting *Frye*, 2010

WL 3862591, at *9).  "However, where plaintiffs have disparate factual and employment settings

. . . defenses likely will be individualized, rendering collective treatment inappropriate." *Id.*

Breck's Ridge did not mention or reference its anticipated defenses in its briefing.  (BR Mot. for

Decert. at 17–18).  Consequently, Plaintiff declines to argue the second *O'Brien* prong, averring that "Plaintiff has already demonstrated that he and the opt-in class members are similarly situated in the first prong."  (*Id.*).

As the Northern District of Ohio found in *Creely*, defenses against FLSA claims for uncompensated mealtimes can be highly individualized.  *Creely*, 920 F. Supp. 2d at 856.  For example, the Creely court found that the defendant "will need to inquire into each Plaintiff's knowledge of the meal break cancellation policy, whether and how often each Plaintiff worked through or was interrupted during a meal break, whether each Plaintiff submitted punch forms and, if so whether they were compensated."  *Id.*  Accordingly, the Court found that "individualized defenses would overwhelm any trial of this case as a collective action."  *Id.*

Once again, this Court finds the present case distinguishable.  In *Creely*, the opt-in plaintiffs were "registered nurses, licensed practical nurses, certified nursing assistants, and admissions coordinators employed by Defendant at facilities across the country."  *Id.* at 852.  As a result, the opt-in plaintiffs' ability to take mealtimes "depended on their particular facility, unit, shift, patient population served, job duties, and individual habits."  *Id.* at 853.  Here, there are only three putative class members.  Plaintiff, Mr. Burrell, and Mr. Howard all worked for Breck's Ridge at the same Columbus, Ohio facility.  While each had slightly different job responsibilities on their work crews—and likely reported to different immediate supervisors—all three ultimately answered to CEO Fissel.  Moreover, as noted *supra*, Plaintiff, Mr. Howard, and Mr. Burrell assert facts supporting a common theory that Breck's Ridge did not compensate employees for missed lunches in violation of the FLSA.  Therefore, this Court agrees with Plaintiff that Breck's Ridge's defenses will not be so distinct as to overwhelm a potential trial.  The second *O'Brien* factor weighs against decertification.

### 3. Degree of Fairness and Procedural Impact

The third *O'Brien* factor requires "courts to consider whether continuing the collective action comports with 'the policy behind FLSA collective actions and Congress's remedial intent by consolidating many small, related claims of employees for which proceeding individually would be too costly to be practical. *Fenley v. Wood Group Mustang, Inc.*, 325 F.R.D. 232, 247 (S.D. Ohio 2018). "While it is true that individuals need not be identically situated in order to proceed in a collective action, there must be some cohesiveness among the employees that would allow for economies of collective treatment." *Id.*

Breck's Ridge does not address the third *O'Brien* factor. (BR Mot. for Decert. at 17–18). However, Plaintiff points out that Breck's Ridge previously admitted that the claims at issue would result in "relatively small" damages. (Pl.'s Opp'n to BR Mot. for Decert. at 12) (citing BR Mot. for Summ. J. at 14). In its Motion, Breck's Ridge stated: "Plaintiff Parker contends he should have received $1,650 for 2016; Opt-in Plaintiff Burrell claims $828.00 in 2017; and, Opt-in Plaintiff Howard claims $575.75 for 2017." (BR Mot. for Summ. J. at 12). Thus, Plaintiff contends that decertifying the class would inhibit judicial efficiency and likely bar the opt-in plaintiffs from pursuing individual relief. (Pl.'s Opp'n to BR Mot. for Decert. at 12) (citing *Kis v. Covelli Enters., Inc.*, 2019 WL 761573, at *3 (N.D. Ohio Feb. 21, 2019) (final certification would "serve the FLSA's policy of consolidating small, related claims, that would be too costly to pursue individually")).

This Court agrees with Plaintiff. Given the small damages at issue, the Court finds the third factor weighs in favor of final certification. Decertifying the class would almost certainly discourage Mr. Howard and Mr. Burrell from bringing costly individual claims. In addition, the small number of opt-in plaintiffs and the factual similarities between their theories limits any

potential prejudice to Breck's Ridge in defending a collective action.  Finally, the Court favors collective action over individual suits for the promotion of judicial efficiency.  Because all three *O'Brien* factors weigh against decertification, Breck's Ridge's Motion to Decertify is **DENIED**.

IV.

### A.  Breck's Paving's Supplemental Affidavits

Breck's Paving filed its Reply brief on August 2, 2019.  (ECF No. 74).  A week later, Breck's Paving moved for leave to file the supplemental affidavits of Carl Castle, Max Laudermilt, Joel Robis, and Steven Bloxam.  (ECF No. 75).  "Generally, a party must include any supporting affidavits to the court with its motion, unless it can show cause for not doing so."  *JPMorgan Chase Bank, N.A. v. Mullen*, No. 2:16-cv-426, 2017 WL 127497, at *4 (S.D. Ohio Jan. 13, 2017) (citing Fed. R. Civ. P. 6(c)(2)).  Upon review, the Court notes the proposed supplemental affidavits do not impact its analysis herein.  Accordingly, the Court declines to make a finding as to their admissibility at this time, because even if they were admissible, consideration of them does nothing to impact this decision.

### B.  Plaintiff's Motion to Strike

On August 20, 2019, Plaintiff moved to strike three other affidavits, including those of Barbara Bloxam, Carlos Medina, and Kevin Imer.  (ECF No. 76).  First, Plaintiff argues that VP Bloxam's Affidavit contains testimony which is inconsistent with her prior Rule 30(b)(6) deposition testimony as a corporate designee.  (Mot. to Strike at 2–3, ECF No. 76).  The Court did not rely on the testimony that Plaintiff contends is inconsistent to reach its decision.  To the extent this issue is relevant to trial, Plaintiff may raise it in the pretrial proceedings.

Second, Plaintiff argues that Breck's Paving attached the affidavits of Carlos Medina and Kevin Imer to its Reply brief in violation of Federal Rule of Civil Procedure 26(e)(1)(a) and Local

Rule 7.2.  *See* Fed. R. Civ. P. 26(e)(1)(a) (a party "must supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect"); S.D. OH Civ. R. 7.2 ("all evidence then available shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence").  While it is true that Breck's Paving failed to submit these affidavits with its primary memorandum, it is currently of no moment.  This is because the affidavits do not impact the Court's analysis in this Opinion and Order.  Therefore, at this juncture, the Court finds it unnecessary to resolve the issues raised in Plaintiff's Motion to Strike, since even if the Court were to consider the affidavits, it does not impact this decision.

## V.

For the reasons stated above, Breck's Paving's Motion to Decertify the Conditional Class Certification is **GRANTED** (ECF No. 61); Breck's Ridge's Motion for Summary Judgment and to Decertify the Conditional Class is **GRANTED in part** and **DENIED in part** (ECF No. 62); and Breck's Paving's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** (ECF No. 63).  Plaintiff's retaliation claim is **DISMISSED**.  The conditional class is **DECERTIFIED** with respect to claims against Breck's Paving.  The opt-in plaintiffs' claims against Breck's Paving are **DIMISSED without prejudice**.  Plaintiff may proceed individually in his claims against Breck's Paving.  The conditional class is **CERTIFIED** with respect to claims against Breck's Ridge.

**IT IS SO ORDERED.**

9-30-2019
**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**